## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| Fred O. Ilegbodu and Charlesetta P. Ilegbodu, | ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | Case No.: |
| Specialized Loan Servicing, LLC, | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

Comes now the Plaintiffs, Fred O. Ilegbodu and Charlesetta P. Ilegbodu and for their Complaint against Specialized Loan Servicing, LLC state the following:

## PARTIES

1. Fred O. Ilegbodu is a natural person residing in Garland, Texas. Ilegbodu is a person and consumer as that term is defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a and a Consumer as defined by Texas Finance Code § 392.001(1).

2. Charlesetta P. Ilegbodu is a natural person residing in Garland, Texas. Ilegbodu is a person and consumer as that term is defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a and a Consumer as defined by Texas Finance Code § 392.001(1).

3. Specialized Loan Servicing, LLC ("SLS") is a foreign limited liability company engaged in the business of servicing home loans secured by real property located in Texas and at all times relevant to these claims was conducting its business in the State of Texas and within this district. SLS was directly engaged in debt collection and is a debt collector as defined by Finance Code § 392.001(5) & (6).

**VENUE & JURISDICTION**

4. The Court has personal jurisdiction over this matter pursuant to 15 U.S.C. § 1681p and the Defendant has the necessary minimum contacts with the State of Texas as this suit arises out of Defendant's specific conduct directed at Plaintiffs in Garland, Texas.

5. Subject matter jurisdiction exists under federal question jurisdiction (28 U.S.C. § 1331) and through diversity jurisdiction (28 U.S.C. §1332) as the amount claimed exceeds $75,000.00 between these diverse parties. This Court has Supplemental Jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

6. Venue lies in this district pursuant to 28 U.S.C. § 1391(b).

**FACTUAL ALLEGATIONS**

7. On or about February 21, 2006, Plaintiffs entered into a Note and Deed of Trust with Reliance Mortgage Company.

8. Sometime thereafter SLS became the loan servicer for this Note and Deed of Trust.

9. Until May of 2013, SLS had not established an escrow account for this loan and Ilegbodu was responsible to pay property taxes directly to the taxing authorities.

10. In May of 2013, SLS established an escrow account including a deficit in said account for payment of past-due property taxes.

11. In June of 2013, SLS and Ilegbodu agreed to a 24 month payment plan to make up the shortage of $14,064.25 in the escrow account when it was established. This plan established a total monthly payment of $2,277.98 with the escrow payment including shortage set at $1,238.33 with the balance of $,1039.65 for principal and interest.

12. After the escrow account was established Ilegbodu continued to make electronic payments of his principal and interest and began sending a separate check each month to pay for escrow.

13. Ilegbodu made and SLS processed payments in this manner for several months.

14. As of the December 2013 billing statement, SLS claimed an amount due on January 1, 2014 of $2,277.98 with no amounts past due.

15. On January 9, 2014, SLS held his electronic payment of principal and interest as a partial payment and did not apply it to his account. In addition, SLS held his check for his escrow payment for weeks without depositing it or processing it until January 30, 2014.

16. On January 30, 2014, SLS finally deposited and processed Ilegbodu's January escrow check received weeks before, and it deposited and processed the February escrow check which it received that day. These payments were both applied to escrow but neither payment was applied as part of the February 2014 payment as intended by Ilegbodu.

17. Instead of applying his principal, interest and escrow payments received in January as the full monthly payment, SLS continued to hold his principal and interest payment in unapplied funds as a partial payment and took the January and February escrow payments and applied these funds as the January escrow payment.

18. This failure to timely apply the January payments caused Ilegbodu's account to appear 30 days late despite SLS having timely received the entire monthly payment due before the due date or before the end of the grace period.

19. This failure also began a cycle of improperly applying payments, holding payments as unapplied, and continued to show the account as past due despite receiving the full monthly payment before the end of the grace period.

20. SLS began calling the Ilegbodus on an almost daily basis to collect on the account.

21. After receiving multiple calls and messages claiming the account was past due, the Ilegbodus called SLS on February 27, 2014. During that call SLS demanded the Ilegbodus provide proof of the payments made in January of 2014. Ilegbodus provided this proof via facsimile on February 27, 2014.

22. On March 6, 2014, SLS closed the "dispute" without an investigation falsely claiming the Ilegbodus failed to provide the requested proof of payments. SLS notified the Ilegbodus of its decision via facsimile dated April 1, 2014.

23. Ilegbodus immediately faxed the requested information again.

24. On April 1, 2014, SLS reversed all payments received since December of 2013 and reapplied the payments. This time it applied the escrow payment received in early January correctly, but then applied the February escrow payment received on January 30, 2014 as a principal curtailment and not as part of the February payment.

25. In correspondence dated February 18, 2014, SLS demanded payment of $3,787.65 by March 1, 2014 despite only $2,277.98 being due as a regular monthly payment.

26. Similar demands for payment of amounts not owed ranging from $3,839.63 to $6,013.65 were made in correspondence dated March 18, 2014, April 1, 2014, May 19, 2014, June 18, 2014, July 18, 2014, and August 18, 2014.

27. In a letter dated July 17, 2014, SLS notified the Ilegbodus that the account was in default and that it intended to accelerate the balance due if it did not receive $2,961.29 in 33 days. SLS admits in this letter that it is attempting to collect a debt.

28. SLS sent a monthly mortgage statement dated July 18, 2014, to the Ilegbodus.  This statement did not include a written notice that the borrower must use a designated address to assert an error or request information.

29. In a letter dated July 20, 2014, and addressed to SLS's Highlands Ranch address, Mr. Ilegbodu provided his name, address and account number.  In this letter Mr. Ilegbodu notified SLS of his belief that SLS had made an error in applying his January and February escrow payments.  To further explain and document the proof of this error, Mr. Ilegbodu provided an itemization of each payment of escrow and principal/interest paid since November 2013; the check number for each payment made by check;  the source of each payment made by bill pay, the date SLS received said payments; the date each payment cleared the Ilegbodus' bank and the method of delivery for each payment.  Mr. Ilegbodu stated his belief that SLS's failure to record the two escrow payments as two separate monthly escrow payments caused a chain reaction that erroneously reflected that the Ilegbodus did not make an escrow payment for the month of February 2014.  Mr. Ilegbodu asked SLS to "please investigate very carefully to avoid unnecessary litigation."

30. This July 2014 letter was a notice of error pursuant to the Real Estate Settlement Procedures Act.

31. On July 21, 2014, SLS again reversed all of the payments received since December of 2013 and reapplied the funds.  This time however, SLS applied the January 30, 2014 funds that were tendered as payment for the February 2014 escrow payment to escrow but without applying it to the February 2014 payment.

32. In a letter dated July 25, 2014, SLS acknowledged receipt of Ilegbodu's dispute, admitted it is a debt collector, and promised a response within 30 business days.

33. In a letter dated August 17, 2014, SLS notified Ilegbodu that the account was in default and that it intended to accelerate the balance due if it did not receive payment of $2,767.98 in 33 days and would proceed with non-judicial foreclosure.

34. SLS sent a monthly mortgage statement dated August 18, 2014, to the Ilegbodus.  This statement did not include a written notice that the borrower must use a designated address to assert an error or request information.

35. In a letter dated August 23, 2014, and addressed to SLS's Highlands Ranch address, Mr. Ilegbodu provided his name, address and account number.  In this letter Mr. Ilegbodu notified SLS of his belief that SLS had made an error in claiming that their July 1, 2014, payment and the payments due each month thereafter had not been made on the account. He went on to communicate his understanding of the error SLS made in applying his January and February escrow payments.  To further explain and document the proof of this error, Mr.  Ilegbodu provided an itemization of each payment of escrow and principal/interest paid since November 2013, this time including payment documentation through August 2014; the check number for each payment made by check; the source of each payment made by bill pay, the date SLS received said payments; the date each payment cleared the Ilegbodus' bank and the method of delivery for each payment.  Mr. Ilegbodu stated his belief that SLS's failure to record the two escrow payments as two separate monthly escrow payments caused a chain reaction that erroneously reflected that the Ilegbodus did not make an escrow payment for the month of February 2014.  Mr. Ilegbodu asked SLS to "please investigate very carefully to avoid unnecessary litigation."

36. This August 2014 letter was a notice of error pursuant to the Real Estate Settlement Procedures Act.

37. In a letter dated September 3, 2014, SLS claimed that the escrow payment had increased on July 1, 2014 by $109.33 and Ilegbodus' failure to pay this increase resulted in a partial payment being held in suspense account and a determination of default. SLS did not provide an Escrow Account Disclosure Statement or Escrow Analysis providing notice of the impending change in his escrow payment. Ilegbodu sent two checks in the amount of $109.33 and a third check in the amount of $1,347.66, which were received by SLS on September 12, 2014, to make up the alleged difference in the escrow payment for July and August 2014 and to pay the new escrow amount for September. As per his usual conduct, $1,039.65 was paid on September 7, 2014, by electronic bill pay.

38. Despite receipt of all funds due, including the disputed increase in the escrow payment by September 12, 2014, SLS sent a Notice of Default and Notice of Intent to Accelerate dated September 19, 2014, demanding payment of $3,674.52 within 33 days.

39. SLS continued to make demands for payment of amounts not owed including demands of $5,892.05 and $6,346.61 made in correspondence dated October 10, 2014, and September 9, 2014.

40. SLS sent a monthly mortgage statement dated October 10, 2014, to the Ilegbodus. This statement did not include a written notice that the borrower must use a designated address to assert an error or request information.

41. Ilegbodu wrote a notice of error letter on October 14, 2014, to SLS at its address in Highlands Ranch, Colorado explaining SLS's continuing error and disputing that he was in default. Mr. Ilegbodu provided his name, address and account number. In this letter Mr. Ilegbodu notified SLS of his belief that SLS had made an error in claiming that their August 1, 2014, payment and the payments due each month thereafter had not been made

on the account.   Ilegbodu also disputed the July 2014 increase in his escrow payment.
To further explain and document the proof of this error, Mr. Ilegbodu provided an
itemization of each payment of escrow and principal/interest paid since November 2013,
this time including payment through October 2014; the check number for each payment
made by check; the source of each payment made by bill pay, the date SLS received said
payments; the date each payment cleared the Ilegbodus' bank and the method of delivery
for each payment.   Mr. Ilegbodu stated his belief that SLS's failure to record the two
escrow payments as two separate monthly escrow payments caused a chain reaction that
erroneously reflected that the Ilegbodus did not make an escrow payment for the month
of February 2014.   Mr. Ilegbodu also pointed out inconsistencies in SLS's billing and
records regarding the amount of his escrow payment.

42. This October 2014 letter was a notice of error pursuant to the Real Estate Settlement
Procedures Act.

43. This letter was acknowledged on October 20, 2014.

44. Ilegbodu continued making his monthly payments and SLS continued to hold funds as
unapplied partial payments despite receiving sufficient timely payment each month.

45. SLS continued to make demands for payment of amounts not owed including demands
for payment of $5,892.05 in correspondence dated November 7, 2014, December 5, 2014,
January 12, 2015, and February 11, 2015.

46. In a letter dated November 13, 2014, SLS admitted it is a debt collector, claimed that it
had confirmed that all payments had posted to the account but for proper application of
funds to the account payment must be received in a single payment.   SLS then stated that
Ilegbodus were past due for the October 1, 2014, payment in the amount of $2,244.92.

This payment amount is less than the $2,387.31 claimed due on October 1, 2014, as the regular monthly payment. The difference is a decrease in the escrow payment from the $1,347.66 SLS claimed was due each month as of July of 2014 to $1,205.27. This letter failed to address all of the concerns raised by the Ilegbodus in their Notice of error.

47. Despite the correspondence back and forth, SLS did not correct the application of payments in January of 2014 and continued to show the account as past due.

48. SLS continued almost daily calls attempting to collect on this account as well as sending individuals to the property for frequent inspections and monthly collection letters.

49. In February of 2015, SLS sent Ilegbodus a letter stating that the 24 month payment plan established in July of 2013 had been completed in March of 2015, that there was an escrow surplus, but that the surplus was not being returned because the account was past due.

50. SLS sent a monthly mortgage statement dated March 11, 2015, to the Ilegbodus. This statement did not include a written notice that the borrower must use a designated address to assert an error or request information.

51. On April 13, 2105, Ilegbodu wrote SLS again at its Highlands Ranch, Colorado address. This letter included their name, address, account number and both a notice of why Ilegbodu believed the early completion of the plan was an error and requesting an explanation of how the plan was completed early when he had not made any extra payments and the original shortage amount was never changed.

52. This April 2015 letter was a notice of error and request for information pursuant to the Real Estate Settlement Procedures Act.

53. Ilegbodus continued making sufficient and timely monthly payments.

54. SLS acknowledged receipt of this letter on April 20, 2015, and responded on May 14, 2015, stating that there was no longer an escrow shortage and claiming that it had found no errors.

55. SLS continued to make demands for payment of amounts not owed including demands of $4,246.78 to $7,089.33 were made in correspondence each month from April of 2015 to November of 2016.

56. SLS continued with repeated, nearly daily collection calls, frequent property inspections and monthly collection letters throughout 2015.

57. The number of calls decreased in 2016 but SLS continued to make multiple collection calls per week, continued with frequent inspections, and continued to send collection letters in to 2017.

58. Despite his continued sufficient and timely monthly payments, SLS again sent a notice of default and intent to accelerate the note dated November 20, 2016.

59. In correspondence dated December 6, 2016, SLS again demanded payment of $7,089.33 despite this amount not being owed.

60. On December 10, 2016, Ilegbodu provided a notice of error and disputed credit reporting related to the account, providing his name, address, account number, and enclosing a 19 page record of the monthly payments he had made.  He sent this letter to SLS at the address identified by SLS in its December 2016 bill as the address at which Notices of Error and Requests for Information should be sent.

61. This December 10, 2016, letter was a notice of error pursuant to the Real Estate Settlement Procedures Act.

62. SLS acknowledged receipt of this Notice of Error on December 19, 2016.

63. Ilegbodu also sent this letter with enclosures to Experian, Equifax, and TransUnion disputing SLS's credit reporting.

64. Upon information and belief, Experian, Equifax, and TransUnion forwarded this dispute to SLS with all relevant information.

65. On December 26, 2016, Equifax sent a response verifying the incorrect credit reporting.

66. Experian responded on December 28, 2016, stating that the disputed information would remain on the account.

67. On January 6, 2017, TransUnion responded to the dispute stating that the disputed information was confirmed by SLS.

68. Upon information and belief, SLS failed to conduct a reasonable investigation into the credit reporting disputes it received from the credit bureaus.

69. Upon information and belief, SLS failed to perform a reasonable investigation of the error addressed in Ilegbodu's December 10, 2016, Notice of Error.

70. On January 6, 2017, SLS demanded payment of $7,089.33 that was not owed.

71. On January 13, 2017, SLS responded to the December 10, 2016, Notice of Error stating that there were no errors and the account was 30 or more days past due.

72. On January 17, 2017, SLS again sent a Notice of Default and Notice of Intent to Accelerate demanding payment of $5,342.58 within 33 days to cure the default.

73. In correspondence dated February 3, 2017, SLS demanded payment of $7,771.14. This is in excess of the amount owed if proper credit for all payments had been provided. On February 3, 2017, SLS failed to apply any funds received to principal and interest.

74. In addition to letter demands for payment of amounts not owed, SLS called Ilegbodus repeatedly on their home phone to collect these amounts from February of 2014 to the present day.

75. The number of calls has varied from week to week but from March 6, 2015, to December 31, 2016, SLS averaged 5 calls per week.

76. On January 31, 2017, Ilegbodus were denied a home refinance by Quicken Loans because Quicken is "not able to refinance a mortgage that is reporting on your credit report with a past due balance."

77. On February 1, 2017, Ilegbodus were denied for a credit card by US Bank due to delinquency on the mortgage account.

78. Upon information and belief, the inaccurate reporting by SLS was a substantial factor in these declines.

79. On February 9, 2017, SLS issued an Escrow Account Disclosure Statement that reflects an escrow surplus of $4,996.63. SLS has wrongfully refused to return this escrow surplus to the Ilegbodus because it has failed to correct its accounting and continues to claim the account is not current.

80. Ilegbodus were injured by this conduct including out of pocket expenses, failure to return escrow surplus, increased interest, assessment of fees and charges that were not owed, failure to reduce principal, denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, worry, fear, distress, frustration, embarrassment, humiliation, loss of sleep, helplessness, hopelessness, depression, irritability, marital strife, affected a job opportunity and exposure, and other negative impacts all to their damages in an amount to be determined by the Jury.

## COUNT I
### VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT ("RESPA"), 12 U.S.C. § 2605

81. Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

82. Ilegbodu's July 20, 2014, correspondence was a notice of error as defined by RESPA as it included his name, address, account number, and provided notice that his payments had not been applied correctly with proof of the payments made and provided the reasons the Ilegbodus believed the account was in error.

83. SLS failed to correct the errors identified in the Notice of Error as required by 12 U.S.C. § 2605(e)(2)(A).

84. Alternatively and upon information and belief, SLS failed to conduct a reasonable investigation into the application of payments in response to the Notice of Errors before stating that there were no errors in the account in its response to the Notice of Error in violation of 12 U.S.C. § 2605(e)(2)(B) & (C).

85. Ilegbodu's August 23, 2014, correspondence was a notice of error as defined by RESPA as it included his name, address, account number, and provided notice that his payments had not been applied correctly with proof of the payments made and provided the reasons the Ilegbodus believed the account was in error.

86. SLS failed to correct the errors identified in the Notice of Error as required by 12 U.S.C. § 2605(e)(2)(A).

87. Alternatively and upon information and belief, SLS failed to conduct a reasonable investigation into the application of payments in response to the Notice of Errors before

stating that there were no errors in the account in its response to the Notice of Error in violation of 12 U.S.C. § 2605(e)(2)(B) & (C).

88. Ilegbodu's October 14, 2014, correspondence was a notice of error as defined by RESPA as it included his name, address, account number, and provided notice that his payments had not been applied correctly with proof of the payments made.

89. SLS failed to correct the errors identified in the Notice of Error as required by 12 U.S.C. § 2605(e)(2)(A).

90. Alternatively and upon information and belief, SLS failed to conduct a reasonable investigation into the application of payments in response to the Notice of Errors before stating that there were no errors in the account in its response to the Notice of Error in violation of 12 U.S.C. § 2605(e)(2)(B) & (C).

91. Ilegbodu's April 13, 2015, correspondence was a notice of error as defined by RESPA as it included his name, address, account number, and both a notice of why Ilegbodus believed the early completion of the plan was an error and requesting an explanation of how the plan was completed early when he had not made any extra payments and the original shortage amount was never changed.

92. SLS failed to correct the errors identified in the Notice of Error as required by 12 U.S.C. § 2605(e)(2)(A).

93. Alternatively and upon information and belief, SLS failed to conduct a reasonable investigation into the application of payments in response to the Notice of Errors before stating that there were no errors in the account in its response to the Notice of Error in violation of 12 U.S.C. § 2605(e)(2)(B) & (C).

94. In the month prior to each of these notices of error, SLS failed to provide notice that notices of error MUST be sent to a specific address stating instead that they may be sent to a specific address.

95. Ilegbodu's December 10, 2016, correspondence was a notice of error as defined by RESPA as it included his name, address, account number, and provided notice that his payments had not been applied correctly with proof of the payments made. This letter was sent to the address established by SLS to receive Notices of Error.

96. SLS failed to correct the errors identified in the Notice of Error as required by 12 U.S.C. § 2605(e)(2)(A).

97. Alternatively and upon information and belief, SLS failed to conduct a reasonable investigation into the application of payments in response to the Notice of Errors before stating that there were no errors in the account in its response to the Notice of Error in violation of 12 U.S.C. § 2605(e)(2)(B) & (C).

98. SLS engaged in a pattern and practice of failing to perform a reasonable investigation upon receipt of notices of error and a pattern and practice of failing to correct the errors.

99. Plaintiffs are entitled to actual and statutory damages as a result of this failure pursuant to 12 U.S.C. § 2605(f) including out of pocket expenses, failure to return escrow surplus, increased interest, assessment of fees and charges that were not owed, failure to reduce principal, denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, worry, fear, distress, frustration, embarrassment, humiliation, loss of sleep, helplessness, hopelessness, depression, irritability, marital strife, affected a job opportunity and exposure, and other negative impacts, all to their damages in an amount to be determined by the Jury.

## COUNT II
### WILLFUL VIOLATION OF THE FAIR CREDIT REPORTING ACT
### ("FCRA" ) 15 U.S.C. §§ 1681 et seq

100.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth

at length herein.

101.    Plaintiffs disputed information provided by SLS to the consumer reporting

agencies regarding this account.

102.    Upon information and belief, the consumer reporting agencies forwarded this

dispute to SLS as required by 15 U.S.C. § 1681s-2(b).

103.    Upon information and belief, SLS willfully failed to conduct a reasonable

investigation of Plaintiffs dispute, including failing to review all relevant information

provided by the consumer reporting agencies,  as required by 15 U.S.C. § 1681s-2(b).

104.    As a result of SLS's violations of the FCRA, Plaintiffs have suffered and continue

to suffer damages, including denial of credit, lost opportunity to receive credit, damage to

reputation, invasion of privacy, worry, fear, distress, frustration, embarrassment,

humiliation, loss of sleep, helplessness, hopelessness, depression, irritability, marital

strife, affected a job opportunity and exposure, and other negative impacts all to their

damages in an amount to be determined by the Jury.

105.    Plaintiffs are entitled to attorney fees, pursuant to 15 U.S.C. § 1681n.

## COUNT III
### NEGLIGENT VIOLATION OF THE FAIR CREDIT REPORTING ACT
### ("FCRA" ) 15 U.S.C. §§ 1681 et seq

106.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth

at length herein.

107.    Plaintiffs disputed information provided by SLS to the consumer reporting

agencies regarding this account.

108.    Upon information and belief, the consumer reporting agencies forwarded this

dispute to SLS as required by 15 U.S.C. § 1681s-2(b).

109.    Upon information and belief, SLS willfully failed to conduct a reasonable

investigation of Plaintiffs dispute, including failing to review all relevant information

provided by the consumer reporting agencies,  as required by 15 U.S.C. § 1681s-2(b).

110.    As a result of SLS's violations of the FCRA, Plaintiffs have suffered and continue

to suffer damages, including denial of credit, lost opportunity to receive credit, damage to

reputation, invasion of privacy, worry, fear, distress, frustration, embarrassment,

humiliation, loss of sleep, helplessness, hopelessness, depression, irritability, marital

strife, affected a job opportunity and exposure, and other negative impacts all to their

damages in an amount to be determined by the Jury.

111.    Plaintiffs are entitled to attorney fees, pursuant to 15 U.S.C. § 1681o.

## COUNT IV
### VIOLATION OF THE TEXAS FINANCE CODE §§ 392.001 ET SEQ

112.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth

at length herein.

113.    In attempting to collect a debt, since March 6, 2015, SLS has repeatedly

misrepresented the character, extent, or amount of a consumer debt in the manner

outlined above in violation of TX FIN § 392.304.

114.    As a result of SLS's violations of the Texas Finance Code, Plaintiffs have

suffered and continue to suffer damages, including denial of credit, lost opportunity to

receive credit, damage to reputation, invasion of privacy, worry, fear, distress, frustration,

embarrassment, humiliation, loss of sleep, helplessness, hopelessness, depression, irritability, marital strife, affected a job opportunity and exposure, and other negative impacts all to their damages in an amount to be determined by the Jury as well as attorney fees pursuant to TX FIN § 392.403.

## COUNT V
### INVASION OF PRIVACY BY INTRUSION UPON SECLUSION

115.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

116.    Since March 10, 2015, SLS has made hundreds of calls to Plaintiffs to collect an amount not owed.  These calls were coupled with dozens of collection letters and notices of default in which SLS threatened to accelerate the note and foreclose as well as dozens of visits by its employees or agents to their home to inspect the property.

117.    Repeated, continuous calls and letters to collect amounts not owed including threats to take their home are highly offensive to a reasonable person and are highly offensive to the Plaintiffs.

118.    Plaintiffs have been damaged by this conduct including worry, fear, distress, frustration, embarrassment, humiliation, loss of sleep, helplessness, hopelessness, depression, irritability, marital strife, affected a job opportunity and exposure, and other negative impacts all to their damages in an amount to be determined by the Jury.

## COUNT VI
### BREACH OF CONTRACT

119.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

120.    The Note, Deed of Trust, related documents and the 24 month payment plan are contracts between Plaintiffs and SLS either directly or as the loan servicer.

121.     SLS has breached these contracts by failing to properly apply payments according to the terms of the contracts including the Note at paragraph 6, the Addendum to the Note at paragraph 1(B), the Deed of Trust at paragraph 2, and the payment plan.

122.     SLS has breached the Note at paragraph 8 and the Deed of Trust at paragraph 22 by declaring a default and acceleration of the note when no such default or right of acceleration exists.

123.     Plaintiffs have been injured by this breach including misapplication of funds, failure to reduce principal, excessive interest charged, assessment of late fees and other default servicing expenses that are not due or owing under the contract, and a failure to return an escrow surplus.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request judgment against Defendant as follows:

1)     For Count I, Violation of RESPA:

   a)  Actual damages in an amount to be determined by a jury;

   b)  Statutory Damages;

   b)  Attorney fees and costs.

2)     For Count II, Willful Violation of the FCRA:

   a) Actual damages in an amount to be determined by a jury;

   b)  Punitive damages;

   c)  Attorney fees and costs.

3)     For Count III, Negligent Violation of the FCRA:

   a) Actual damages in an amount to be determined by a jury;

   b)  Attorney fees and costs.

a) Actual damages in an amount to be determined by a jury;

b) Attorney fees and costs.

4)            For Count IV, Violation of the Texas Finance Code:

a) Actual damages in an amount to be determined by a jury;

b) Attorney fees and costs.

5)    For Count V, Invasion of Privacy:

a) Actual damages in an amount to be determined by a jury;

b) Punitive damages.

6)    For Count VI, Breach of Contract:

a) Actual damages in an amount to be determined by a jury.

7)    Trial by Jury is requested on all claims for relief.


**Prevost, Shaff, Mason, & Carns, PLLC.**

By: _____
Neal Prevost, Tx Bar #00788222
1518 Legacy Dr., Ste. 260
Frisco, TX 75034
sonya@psmclaw.com
972-239-6200/972-239-6205 Facsimile

and

David Humphreys, OBA # 16070
Luke Wallace, OBA # 12346
Paul Catalano, OBA # 22095
9202 South Toledo Avenue
Tulsa, Oklahoma 74137
918-747-5300 / 918-747-5311 Facsimile
**ATTORNEYS FOR PLAINTIFF**